**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **GWENDOLYN MURPHY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:17-CV-01260-M-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed August 7, 2017 (doc. 14.). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED.**

**I. BACKGROUND**[1]

Gwendolyn Murphy (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her application for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (doc. 14.)

**A.    Procedural History**

On January 7, 2014, Plaintiff filed an application for DIB, alleging disability beginning on January 1, 2010. (R. at 184.) Her claim was denied initially and upon reconsideration. (R. at 108, 119.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on October 30, 2015. (R. at 40-100.) On February 1, 2016, the

---

[1]    The background information is summarized from the record of the administrative proceeding, which is designated as "R."

ALJ issued a decision finding Plaintiff not disabled and denying her claim for benefits. (R. at 10-29.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 39.) The Appeals Council denied her request for review on April 11, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 1-6.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B. Factual History

### 1. Age, Education, and Work Experience

Plaintiff was born on October 10, 1979, and was 36 years old at the time of the first hearing before the ALJ. (R. at 44.) She obtained a high school equivalency diploma, a beauty school certificate, and a phlebotomy license that is no longer active. (R. at 44-45.) She had past relevant work as a receptionist and waitress. (R. at 91.)

### 2. Medical Evidence

Plaintiff's relevant medical evidence began on January 28, 2009, when she presented to Parkland Hospital Emergency Services (Parkland Hospital) for back pain. (R. at 297.) She had recently moved to Dallas and requested a referral for a local orthopedist and pain management physician. (R. at 308.) She reported two back surgeries for scoliosis at ages 17 and 27 and was receiving pain management treatment when she lived out of state. (R. at 303.) The pain was to her middle to lower back and was a "chronic problem" occurring every several days. (R. at 302-03.) Plaintiff described the pain as mild, aching in quality, and rated the severity as 4 out of 10. (R. at 303.) She was noted to have full musculoskeletal range of motion with mild discomfort with straight leg raises, but her gross motor movements were intact, and she ambulated easily. (R. at 298.)

On February 26, 2010, Plaintiff presented to Methodist Richardson Medical Center

(Methodist Center) with complaints of severe neck pain and headache, which she described as "aching with radiation from neck to forehead" and "constant." (R. at 605.) She was diagnosed with aseptic meningitis and remained in the hospital for several days, where she was observed as "looking miserable" and "having severe photophobia" for the first couple of days. (R. at 618-19.) She was also "distressed because of pain and was not staying awake most of the time." (R. at 621.) It was also noted that she had a history of similar meningitis about five years before and had "chronic low back pain." (R. at 619.) A CT scan of her head was normal. (R. at 613.)

On March 5, 2010, Dr. Arif Khan, M.D., visited Plaintiff in the hospital for pain management and conducted a physical examination. (R. at 626.) He observed "minimal tenderness of the cervical spine in the paravertebral area" but "could not palpate any trigger points." (R. at 627.) He reported that "[f]lexion of the cervical spine led to increase in her neck pain and headaches," but "still fe[lt] she ha[d] an element of meningeal inflammation." (*Id.*) Dr. Khan suggested that a Lidoderm 5% patch be applied locally to the cervical spine area. (*Id.*) Plaintiff's condition stabilized and improved, and she was subsequently discharged from the hospital on March 7, 2010. (R. at 621.)

On January 5, 2011, Plaintiff returned to Methodist Center for moderate pain in the left lower quadrant (LLQ) of her abdomen. (R. at 553.) She described the pain as sharp and the severity as 9 out of 10. (*Id.*) She reported the pain as constant and worsening since the prior day. (*Id.*) She had an "unremarkable" pelvic ultrasound impression, which also showed that "previously demonstrated simple ovarian cysts bilaterally ha[d] resolved." (R. at 559.) She was diagnosed with pelvic pain and was discharged later the same day. (*Id.*)

Plaintiff's abdominal pain continued to increase, and on January 19, 2011, she presented to Parkland Hospital for treatment. (R. at 335.) She reported that the pain worsened by movement, but

would improve when she put pressure on her abdomen. (R. at 336.)  Her musculoskeletal range of motion was observed as normal. (R. at 337.)  After a CT scan of her abdomen and pelvis, Dr. Sheldon Blend, M.D., noted that Plaintiff "ha[d] extensive thoracolumbar spine hardware from previous surgery," which significantly limited his examination.  (R. at 338.)  He recognized her scoliosis and observed "[e]xtensive surgical changes ... in the thoracolumbar spine from approximately T11-L4." (*Id.*)  "Mild nonspecific heterogeneity [was] appreciated in the right posterior iliac bone adjacent to the SI joint of uncertain significance" and "[p]araspinous muscle atrophy [was] mild greater on the right," but "[n]o acute abnormality [was] otherwise appreciated." (*Id.*)  She was discharged the same day with pain medication and a colonoscopy referral. (R. at 337.)

On February 2, 2011, Plaintiff returned to Parkland Hospital for a follow-up visit with Dr. Sentayehu Kassa, M.D. (R. at 350.)  She reported that her symptoms had remained "unchanged" since onset three months prior. (*Id.*)  She described the pain as aching and rated its intensity as 7 out of 10. (*Id.*)  She was observed as having mild tenderness in the LLQ of her abdomen. (R. at 351.) Dr. Kassa also noted that Plaintiff was negative for myalgias and back pain. (*Id.*)  She was assessed with abdominal pain of an unspecified site and prescribed Tramadol 50mg. (*Id.*)

On March 21, 2011, Plaintiff returned to Parkland Hospital with rectal bleeding. (R. at 363.) She complained that her abdominal pain was constant and would worsen on occasion. (*Id.*)  She had tenderness to the LLQ of her abdomen, as well as a small external hemorrhoid. (R. at 364.)  She was instructed to schedule a colonoscopy as ordered by her primary care physician. (*Id.*)

On March 29, 2011, Plaintiff presented back to Parkland Hospital for a colonoscopy. (R. at 366.) The colonoscopy showed internal hemorrhoids and a polyp in the LLQ of her abdomen, which was removed and submitted to pathology. (R. at 368.)  A biopsy was performed, and the polyp was

diagnosed as a tubular adenoma (non-cancerous). (R. at 369.)

Plaintiff continued experiencing abdominal pain and presented to Parkland Hospital for treatment on April 4, 2011, and April 15, 2011. (R. at 371, 375.)  During both visits, she described the pain as sharp and constant in nature, and was observed as having tenderness to her abdomen. (*Id.*) No significant changes were observed in those visits, other than revisions to her prescription for pain medication. (*Id.*)

On May 27, 2011, Plaintiff returned to Parkland Hospital for evaluation of her abdominal pain. (R. at 381.) She visited with Dr. Gerald Matchett, M.D., the attending anesthesiologist at Parkland Hospital, who noted that this was a "complex case" because Plaintiff's pain seemed to be in her abdominal wall, but she also had a "complex spine history." (R. at 384.)  He suspected that her pain could be the result of a somatic nerve problem or a thoracic radiculopathy. (*Id.*)  He recommended "a thoraco-lumbar flex-ex series to rule out gross instability of her fusion" and "an MRI scan to rule out soft-tissue problems of her thoraco-lumbar spine." (*Id.*)  An x-ray of the lumbar spine revealed "[e]xtensive postsurgical changes of the lumbar spine," but no "apparent instability." (R. at 379, 389.)  The MRI of her thoracic spine showed scattered hemangiomas throughout the thoracic spine. (R. at 391.)  It also showed the alignment and vertebral body heights were maintained and the bone marrow signal was within normal limits. (*Id.*)  The MRI further revealed that the spinal cord signal and parspinal soft tissues were "unremarkable," and there were "no significant disc herniation or spinal canal stenosis [] noted." (*Id.*)  Dr. Matchett diagnosed thoracic radiculpathy and recommended bilateral T10-T12 nerve root blocks or selective paravertebral blocks. (R. at 394.)

On September 7, 2011, Plaintiff presented to Parkland Hospital for her bilateral T12 paravertebral blocks operation, which was conducted by Dr. Matchett. (R. at 408.)  He observed "a

substantial amount of fusion hardware posteriorly and also on the right anterior lateral surface." (*Id.*) He noted there was "selective nerve root spread" and "a small amount of epidural spread which [was] not necessarily surprising." (R. at 409.) He placed the nerve block solution on both sides of the T12 pedicle and completed the operation. (R. at 408-09.)

On October 5, 2011, Plaintiff visited with her primary physician, Dr. Daniel Chen, M.D., for chronic low back pain and left low abdominal pain over the prior one and a half years. (R. at 484.) She reported numbness of her low back and described the low back pain as constant and aching at an 8 out of 10 on the pain scale. (*Id.*) She also reported constant and "needle-like" pain to her left low abdomen with a pain at 7 out of 10. (*Id.*) She rated her current overall pain as an 8 out of 10. (*Id.*) She rated the worst pain as a 10 out of 10, and the least amount of pain as a 6 out of 10. (*Id.*) Her pain greatly interfered with her general daily activities, including the ability to walk and do "normal work," and completely interfered with her relationship with others, sleep, and "enjoyment of life." (*Id.*) She reported taking Gabapentin, Tizanidine, and Nortriptyline to manage her pain. (*Id.*) Plaintiff was asked to rate her pain according to the Functional Pain Activity Scale when doing certain activities in the past month. (*Id.*) She reported moderate pain when sitting down to eat, and moderate to severe pain when getting dressed, moving or walking around the house, and bathing or showering. (*Id.*) She had severe pain when traveling, participating in a hobby or interest, and shopping. (*Id.*) She reported severe to very severe pain when performing chores around the house, getting up from a seated position, and getting up from a lying position, as well as very severe pain when engaging in sexual activity. (*Id.*) She also noted that her overall pain would be severe to very severe without using pain medications. (*Id.*) Dr. Chen observed "[t]enderness and sensitive to touch over [the] right low back." (*Id.*) He diagnosed her with lumbago, postlaminectomy syndrome of

6

lumbar region, scoliosis, insomnia, abdominal pain of the LLQ, and meningitis. (R. at 484-85.)

From October 2011 to May 2012, Plaintiff would visit Dr. Chen approximately every other week for treatment of her low back pain and left lower abdominal pain. (R. at 459-83.)[2] She described the pain as aching, sharp, numb, stabbing, burning, throbbing, shooting, and miserable, and it would occur constantly with associated symptoms of numbness and muscle spasms. (*See generally id.*) On a scale of 0 to 10, with 0 being no pain and 10 being the most pain, her pain rating throughout this time-frame ranged between 5 to 8 out of 10. (*Id.*) On a scale of 0 to 10, with 0 indicating pain did not interfere and 10 indicating pain completely interfered, her rating of the interference of general activities caused by her pain ranged between 7 to 8 out of 10 during this time-frame. (*Id.*) Dr. Chen prescribed Neurontin, Zanaflex, Norco, and Ultram to manage her pain. (*Id.*) Plaintiff reported that the pain medication, heating pads, and ice packs would relieve the pain, but doing too much of anything increased the pain. (*Id.*)

From July 2012 to August 2012, Plaintiff continued to see Dr. Chen regarding her back and abdomen pain. (R. at 457-58, 512-14.)[3] The intensity of her pain and level of interference caused by the pain remained in the moderate to severe range. (*See generally id.*) Dr. Chen noted that her gait and posture were normal, but there was limited range of motion in her back, as well as palpitation myofascial trigger points and muscle spasms over the lower back. (*Id.*)

---

[2] The specific dates Plaintiff visited Dr. Chen were October 17, 2011 (R. at 483); November 7, 2011 (R. at 481-82); November 22, 2011 (R. at 479-80); December 12, 2011 (R. at 477-78); December 29, 2011 (R. at 475-76); January 17, 2012 (R. at 473-74); February 3, 2012 (R. at 471-72); February 20, 2012 (R. at 469-70); March 5, 2012 (R. at 467-68); March 20, 2012 (R. at 465-66); April 3, 2012 (R. at 463-64); April 17, 2012 (R. at 461-62); and May 3, 2012 (R. at 459-60).

[3] The specific dates Plaintiff visited Dr. Chen were July 23, 2012 (R. at 457-58); August 14, 2012 (R. at 514); and August 27, 2012 (R. at 512-13).

On August 31, 2012[4], Plaintiff presented to Medical Center of Plano with a headache and fever. (R. at 440.) She described her symptoms as a "global headache" with neck pain, and the severity of the pain as "moderate." (*Id.*) She also reported moderate, generalized muscle aches involving the back. (*Id.*) A CT scan of her head showed no acute intracranial finding. (R. at 448.) She was assessed with clinical fever, acute headache, and acute viral syndrome and prescribed Vicodin, Naproxen, and Flexeril, and was later discharged upon improvement. (R. at 443-44.)

From September 2012 to February 2013, Plaintiff returned to Dr. Chen approximately every other week for her back and abdominal pain. (R. at 494-511.)[5] She continued experiencing moderate to severe pain, which caused moderate to severe interference with her daily activities. (*See generally id.*) Her gait and posture remained normal, and she continued to have limited range of motion in her back. (*Id.*) Plaintiff, however, noted that she did not feel the need for a dosage or medication change, and was not experiencing any side effects from her pain medication. (R. at 494-510.)

On March 7, 2013, Plaintiff presented to Methodist Center with complaints of back pain after falling in an airport restroom. (R. at 524.) The lower back pain had gotten progressively worse over the last five days, and she described it as sharp shooting pain that radiated down her right leg and was exacerbated with movement or when sitting up. (*Id.*) Her back showed no costovertebral angle tenderness or vertebral tenderness. (R. at 526.) An x-ray of her lumbar spine revealed no definite compression deformity within the lumbar spine. (R. at 527.) Plaintiff was assessed with acute low back pain and chronic pain and discharged in stable condition. (*Id.*)

---

[4] The ALJ incorrectly identified the date as September 31, 2012. (*See* R. at 17.)

[5] The specific dates Plaintiff visited Dr. Chen were September 19, 2012 (R. at 511); October 8, 2012 (R. at 509-10); November 1, 2012 (R. at 508); November 19, 2012 (R. at 506-07); December 3, 2012 (R. at 504-05); December 21, 2012 (R. at 502-03); January 7, 2013 (R. at 500-01); January 24, 2013 (R. at 498-99); February 12, 2013 (R. at 496-97); and February 28, 2013 (R. at 494-95).

On March 14, 2013, Plaintiff presented to Texas Back Institute for a severe episode of low back pain and right lower extremity pain resulting from her fall at the airport and was evaluated by Dr. Jessica Shellock, M.D. (R. at 422.) She recounted her long history of back problems and prior spinal surgeries. (*Id.*) Dr. Shellock noted that Plaintiff had "some chronic underlying back pain and diffuse at pain management specialist." (R. at 420.) Plaintiff reported that her current pain was extremely different from anything she previously experienced, rating her low back pain as a 10 out of 10 on the visual analogue scale (VAS) scale and her leg pain as a 5 out of 10. (*Id.*) She also claimed that she was "physically unable to work due to back/neck problems," and her pain prevented her from participating in other daily activities because she could not walk. (R. at 422.) Dr. Shellock reported that Plaintiff was oriented and cooperative, but was sitting uncomfortably and had "difficulty acquiring a full, upright position when getting out of the chair." (R. at 423.) She was observed leaning to the left, her gait was antalgic to the right, and she had scoliosis of the lumbar region on the left side. (*Id.*) Dr. Shellock also noted that Plaintiff's paravertebral muscles were tender bilaterally with bilateral spasms, and her lumbar range of motion was painful. (*Id.*) She diagnosed Plaintiff with severe episode of low back pain and right lower extremity pain without motor deficit, status post to prior lumbar procedures with scoliosis surgery and lateral interbody fusion. (R. at 423-24.) She prescribed a Medrol-dose pack and recommended a follow-up. (R. at 424.)

On the next day, Plaintiff saw Dr. Chen for the pain to her back, hips, and legs resulting from the airport fall. (R. at 492.) He noted that Plaintiff had twisted her back, which hurt the bottom left side of her back, and she had right leg and thigh pain. (*Id.*) She reported her pain before treatment at 10 out of 10, and after treatment at 8 out of 10. (*Id.*) A heating pad, cold pad, massage, and

medication relieved her pain, but she felt the need for a dosage or medication change. (*Id.*) Dr. Chen noted that her gait and posture were worse, and she was limping. (*Id.*) He also noted that she had limited range of motion in her lower back, had muscle spasms over her lower back, and could not get comfortable. (*Id.*)

On March 28, 2013, Plaintiff returned to Dr. Chen for a follow-up visit. (R. at 490.) She continued feeling pain down her back and legs, but her pain before treatment improved to an 8 out of 10 and after treatment to a 4 out of 10. (*Id.*) She noted that stress, insomnia, and her children caused her pain, but she did not need a change to her medication or dosage. (*Id.*) Dr. Chen reported that her gait and posture appeared normal, but the limited range of motion in her back remained the same. (*Id.*) He also reported that her pain radiated from her lower back to her right leg and left pelvis, and that Plaintiff experienced a sensory loss and a tingling sensation in her right leg. (*Id.*) Dr. Chen encouraged her to use an ice and heating pack to ease her pain, to exercise, and to use a back supporter. (*Id.*)

On April 9, 2013, Plaintiff presented to Medical Center of Plano after sustaining a fall while walking a dog. (R. at 431.) She had minor pain in both hands, right and left great toes, and left elbow. (*Id.*) She voiced concern about the rods in her back, but denied any back pain. (R. at 434.) The range of motion in her neck and back was normal, and her clinical picture did not suggest head or spinal injury. (R. at 433.) X-rays of her left elbow and right and left toes showed no fractures or dislocations. (R. at 432.) Plaintiff was prescribed Norco 5mg and discharged. (*Id.*)

From April 2013 to November 2013, Plaintiff returned to Dr. Chen approximately every

other week for continued pain in her back and down her leg and hip.[6] (R. at 655-74.)[7]  Throughout

this time-frame, she rated her pain as an 8 out of 10 before treatment, and a 4 out of 10 after

treatment. (*See generally id.*)  She continued describing her pain as aching, burning, numb, sharp,

shooting, stabbing, and throbbing and noted that it was associated with symptoms of muscle spasms,

tingling, and weakness almost all the time. (*Id.*)  At each visit, Dr. Chen observed that her gait and

posture were normal, but there was limited range of motion in her back. (*Id.*)  He updated Plaintiff's

diagnoses with lumbargo, postlaminectomy syndrome of lumbar region, scoliosis, insomnia,

meningitis, pain in limb[8], and pain in joint limb involving pelvic region and thigh[9]. (*Id.*)

At her visit with Dr. Chen on December 5, 2013, Plaintiff reported that it felt like her lower

back "popped out of place." (R. at 653.)  She also noted that she had to "take some extra medication"

due to increasing pain. (*Id.*)  She told Dr. Chen that she took "new x-rays for your review to see if

you might be able to see why this is happening and [gave] you my old x-rays for you to compare

them to." The December 3, 2013 x-rays of her lumbar spine revealed right convex scoliosis

measuring 14 degrees, and right paraspinal rod with screws into the vertebral bodies at T12, L1, L2,

and L3. (R. at 641.)  There was a left paraspinous plate with screws at L3 and L4 vertebral bodies

with an interbody fusion device. (*Id.*)  The impression noted "the proximal hook of the left spinal

---

[6]  Plaintiff was not reporting pain in her abdomen. (*See* R. at 457-95.)

[7]  The specific dates Plaintiff visited Dr. Chen were April 15, 2013 (R. at 488-89); May 2, 2013 (R. at 486-87); May 28, 2013 (R. at 673-74); June 10, 2013 (R. at 671-72); June 24, 2013 (R. at 669-70); July 23, 2013 (R. at 667-68); August 12, 2013 (R. at 665-66); August 29, 2013 (R. at 663-64); September 17, 2013 (R. at 661-62); October 7, 2013 (R. at 659-60); October 24, 2013 (R. at 657-58); and November 12, 2013 (R. at 655-56).

[8]  Dr. Chen added the "pain in limb" diagnosis in May 2013. (R. at 656-74.)

[9]  Dr. Chen added the "pain in joint limb involving pelvic region and thigh" diagnosis in June 2013. (R. at 656-72.)

or Harrington rod [did] not appear associated with a bony structure", and "[r]ight convex scoliosis measuring 14 degrees." (*Id.*) The X-ray of her thoracic spine revealed scoliosis and mild degenerative change. (R. at 643.) Plaintiff was prescribed Butrans patch, Zanaflex, and Norco. (R. at 654.)

On December 30, 2013, Plaintiff presented to Methodist Center with flu symptoms along with lower left back pain radiating to her left flank, right shoulder/neck pain, headache, cough, and fever, and she received differential diagnoses of influenza, viral, and chronic pain. (R. at 519, 521.) She was ultimately diagnosed with influenza. (R. at 523.) On the same day, Plaintiff visited Dr. Chen for continued treatment of her back, hip, and leg pain. (R. at 651.) She told the doctor that she went to the hospital because she had the flu and back pain. (*Id.*) She noted that "[t]he MRI showed she had a rod out from the space." (*Id.*) She revealed that she "[had been] taking more of the Norco due to the patch being reduced and the pain increase." (*Id.*)

On January 22, 2014, Plaintiff visited Dr. Chen for continued treatment of her back, hip, and leg pain.[10] (R. at 743.) Dr. Chen observed that she did have movements causing pain and her gait and posture were worse. (*Id.*) He also noted that there was limited range of motion in her back and she continued experiencing muscle spasms over the lower back. (*Id.*) Nevertheless, she continued rating her pain before treatment as an 8 out of 10, and a 4 out of 10 after treatment. (*Id.*) She did not feel the need for a dosage or medication change. (*Id.*)

On February 13, 2014, Plaintiff visited Dr. Chen and complained that the intensity of her pain

---

[10] There are two versions of records from Plaintiff's visit with Dr. Chen on January 22, 2014. The first had a print date of March 10, 2014, and stated in part, "The patient does not have movements that cause pain. The patient's gait and posture are normal." (R. at 649.) The second had a print date of July 30, 2014, and provided: "The patient does have movements that cause pain. The patient's gait and posture are worse." (R. at 743.) The ALJ's decision referenced the second version but did not address the discrepancies. (R. at 19.)

had been increasing.[11] (R. at 741.) She rated her pain before treatment as a 9 out of 10, and a 6 out of 10 after treatment. (*Id.*) She reported a pinched nerve but had not gone to the emergency room. (*Id.*) Dr. Chen observed that her gait and posture were in a worsened condition, and she continued having pain with certain movements. (*Id.*) At a March 6, 2014 visit with Dr. Chen, the intensity of her pain had returned to her prior rating of an 8 out of 10 before treatment, and a 4 out of 10 after treatment.[12] (R. at 739.) Her other symptoms remained the same. (*Id.*)

On April 1, 2014, Plaintiff presented to Texas Back Institute of Plano for a follow-up visit regarding back pain that she had been experiencing the past two years. (R. at 696.) She was assessed with continued significant low back pain, bilateral lower extremity radicular pain, and significant decreased functional level. (R. at 700.) She reported that she had received significant relief from the Medrol Dosepak she received last year, but her back pain had continued to increase, and she had "numbness and pain into bilateral buttocks and upper thighs circumferentially." (R. at 696.) She had been unable to work because of her back problems and rated her ability to enjoy life "fair." (R. at 698.) She was observed sitting comfortably and did not have difficulty getting out of her chair. (R. at 699.) Her paravertebral muscles were tender bilaterally and her lumbar range of motion was restricted to the following: flexion was painful at 75% of normal; extension was painful at 25% of

---

[11] There are two versions of records from Plaintiff's visit with Dr. Chen on February 13, 2014. The first had a print date of March 10, 2014, and stated: "The patient does not have movements that cause pain. The patient's gait and posture are normal." (R. at 647.) The second had a print date of July 30, 2014, and provided: "The patient does have movements that cause pain. The patient's gait and posture are worse." (R. at 741.) The ALJ's decision did not reference either version or address the discrepancies. (*See* R. 10-29.)

[12] There are two versions of records from Plaintiff's visit with Dr. Chen on March 6, 2014. The first had a print date of March 10, 2014, and stated: "The patient does not have movements that cause pain. The patient's gait and posture are normal." (R. at 645.) The second had a print date of July 30, 2014, and provided: "The patient does have movements that cause pain. The patient's gait and posture are worse." (R. at 739.) The ALJ's decision did not reference either version or address the discrepancies. (*See* R. 10-29.)

normal; lateral bending to the right was painful at 25% of normal; and lateral bending to the left was painful at 50% of normal. (*Id.*) Her gait was normal and straight leg raises were normal bilateral with no issues. (*Id.*) A CT scan revealed solid union of thoracolumbar fusion, and the hardware was in good position. (R. at 693.) An MRI showed a normal L4-5 disc, but right-sided L5-S1 disc herniation. (*Id.*) Plaintiff was assessed with L5-S1 disc herniation, T11-L4 fusion, and lumbar radicular syndrome, and her diagnoses were idopathic scoliosis, lumbar postlaminectomy syndrome, and lumbosacral neuritis or radiculitis. (R. at 693-94.)

From April 2014 to July 2014, Plaintiff saw Dr. Chen for pain to her back and hip. (R. at 494-511.)[13] She continued experiencing moderate to severe pain, which caused moderate to severe interference with her daily activities. (*See generally id.*) Dr. Chen observed that she continued to have pain with movement, and that her gait and posture were worse. (*Id.*) He also noted that there was limited range of motion in her back, and she continued experiencing muscle spasms over the lower back. (*Id.*) Dr. Chen noted that Plaintiff's pain radiated from the lower back to the right hip, and she was experiencing sensory loss in the right hip and tingling sensations in the right and left hip.[14] (*Id.*) Nevertheless, she did not feel the need for a dosage or medication change, and did not experience any side effects from the pain medication. (*Id.*)

On May 20, 2014, Dr. James Wright, M.D., a state agency medical consultant (SAMC), completed a Case Assessment Form (CAF). (R. at 101-09.) He found that Plaintiff had severe medically determinable impairments of reconstructive surgery of weight bearing joint and curvature

---

[13] The specific dates Plaintiff visited Dr. Chen were April 21, 2014 (R. at 735-36); May 5, 2014 (R. at 733-34); June 2, 2014 (R. at 731-32); June 23, 2014 (R. at 729-30); and July 14, 2014 (R. at 727-28).

[14] Plaintiff first started experiencing these symptoms in May 2014. (R. at 727-34.)

of the spine. (R. at 105.)  His summary of relevant medical evidence noted that in March 2014, she was observed as not having movements causing her pain; normal gait and posture; decreased range of motion; and muscle spasms in her lower back. (*Id.*)  He noted her diagnoses of postlaminectomy syndrome and scoliosis. (*Id.*)  He also noted that in April 2014, she was observed sitting comfortably; having no difficulty acquiring full, upright position when getting out of a chair; able to stand erect; and having a balanced gait. (*Id.*)  Examination revealed paravertebral muscles tender bilaterally, decreased lumbar range of motion, normal straight leg raises, and broad-based disc protrusion. (*Id.*)  She was assessed with continued significant low back pain, bilateral lower extremity radiculopathy, and significant decreased functional level. (*Id.*)  He also noted that in May 2014, she was assessed with lumbar radicular syndrome, which was based on a CT scan that revealed solid union of thoracolumbar fusion and hardware in position, and an MRI that showed a normal L4-5 disc, but disc herniation of the right-sided L5-S1 disc. (R. at 104.)  The SAMC considered Plaintiff's functional reports, precipitating and aggravating factors, and medication treatment, but did not find that her statements about the intensity, persistence, and functionally limiting effects of her symptoms were substantiated by the objective medical evidence. (R. at 105-06.)  He found that her alleged limitations were partially supported by the medical evidence of record, but the alleged severity and limiting effects from the impairments were not wholly supported. (R. at 106.)  Dr. Wright assessed Plaintiff's residual functional capacity (RFC) and noted that her exertional limitations were lifting or carrying 20 pounds occasionally and 10 pounds frequently, and standing, walking, or sitting for about six hours in an eight-hour workday. (*Id.*)

On June 19, 2014, Plaintiff returned to Dr. Bosita for hardware pain. (R. at 710.)  He noted that Plaintiff was alert and oriented. (*Id.*)  He observed her being able to sit comfortably with no

difficulty in acquiring a full, upright position when getting out of the chair. (*Id.*) She could stand erect, and her gait was balanced. (*Id.*) He reported that her paravertebral muscles were tender on the right, and lumbar range of motion was painful. (*Id.*) Her straight leg raises were normal bilaterally with no issues, and lower extremity strength was symmetrical and present in all lower muscle groups. (*Id.*) Dr. Bosita diagnosed Plaintiff with scoliosis, post-laminectomy syndrome, and lumbosacral neuritis or radiculitis, and ordered a hardware block injection of Lidocaine/Marcaine. (R. at 711.)

On August 7, 2014, Dr. Kavitha Reddy, M.D., a SAMC, completed a CAF for reconsideration of the May 20, 2014 disability determination by Dr. Wright. (R. 111-20.) Based upon all the evidence in the record, she reaffirmed Dr. Wright's prior determination of "not disabled." (R. at 119.) She agreed that Plaintiff's reconstructive surgery of weight bearing joint and curvature of the spine were severe medically determinable impairments. (R. 116.) She also found that Plaintiff's alleged limitations were only partially supported by the evidence of record. (R. at 115.) She further reaffirmed Dr. Wright's RFC assessment. (R. at 117.)

From April 2015 to October 2015, Plaintiff visited Dr. Cameron Carmody, M.D., at Plano Orthopedic approximately once a month.[15] (R. at 750-80.) She reported pain to her right hand, right hip and thigh, mid and lower back, buttocks, and tail bone. (R. at 775-76.) She described the pain as constant and getting worse, as well as being sharp, stabbing, throbbing, aching, burning, and shooting. (R. at 777.) She also reported that the pain would get worse when she was walking, sitting, bending, standing, lifting, and moving. (*Id.*) She noted additional symptoms of tingling, weakness, numbness, stiffness, limping, and locking. (*Id.*) Her pain rating would range between a 6 and 9 out

---

[15] The specific dates Plaintiff visited Plano Orthopedic were April 3, 2015 (R. at 775-80); May 29, 2015 (R. at 771-74); June 24, 2015 (R. at 767-70); July 13, 2015 (R. at 763-66); August 17, 2015 (R. at 759-62); October 5, 2015 (R. at 755-58); and October 14, 2015 (R. at 750-56).

of 10 during this period. (R. at 750-80.)

On September 28, 2015, and October 14, 2015, Plaintiff returned to Dr. Chen for continued pain in her back, hip, and leg. (R. at 787-90). At both visits, she rated her pain as an 8 out of 10 before treatment, and a 6 out of 10 after treatment. (R. at 787, 789.) Dr. Chen noted that she was still having movements causing her pain, and her gait and posture remained worse. (*Id.*) He also noted that there was limited range of motion in her back, and she continued experiencing muscle spasms over the lower back. (*Id.*) He prescribed Zanaflex, Butrans patch, and Norco. (R. at 788, 790.)

On October 22, 2015, Dr. Chen provided a medical source statement regarding Plaintiff's pain syndrome, its severity and nature, and the extent of functional limitations from October 5, 2011 to October 22, 2015. (R. at 781.) He found that Plaintiff suffered from chronic pain syndrome, neuropathy, scoliosis, and bilateral lower extremity radiculopathy. (R. at 782.) Dr. Chen noted that her pain stemmed from the right side of the lumbosacral spine, as well as the right hip and leg. (*Id.*) Stress and movement or overuse precipitated her pain. (*Id.*) Dr. Chen opined that her physical impairments were "reasonably consistent with the pain, symptoms and functional limitations described in this evaluation." (*Id.*) He did not want her subjected to work stress and opined that her pain was severe enough to interfere often with her attention and concentration. (R. at 783.) He also opined that Plaintiff would not be able to perform sustained work on a regular and continuing basis because she suffered from scoliosis and complications from multiple surgical procedures. (*Id.*) He thought that she would experience drowsiness and loss of concentration as a result of her medications and did not believe that she was a "malingerer." (R. at 784.) Plaintiff was likely to have "good days" and "bad days," but she would probably be absent from work more than four times a month as a result of her medical condition. (*Id.*)

17

### 3.    October 30, 2015 Hearing

Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ on October 30, 2015. (R. at 40-100.) Plaintiff was represented by an attorney. (R. at 42.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she obtained a GED and also went to makeup and phlebotomy school. (R. at 44-45.)  She previously worked as a waitress and a receptionist. (R. at 46.)  The last time she worked was in 2007, after being put on temporary disability. (R. at 46-47.)

According to Plaintiff, the main problem that interfered with her work was pain in her back and joints, which also affected her leg and right hip. (R. at 48, 50.) She needed help with shaving her legs, putting on shoes, cutting her toe nails, and anything requiring her to bend over or lift her leg. (R. at 51-52.)  She estimated that she could spend no more than 20 minutes per day on household chores. (R. at 52.)  She could assist her husband with some household chores, but could not handle any tasks that required her to bend down, like loading and unloading the dishwasher or washer and dryer. (R. at 51-52.)

Plaintiff could sit down to watch TV approximately two hours a day, and could help her son with his homework for about an hour a day. (R. at 53.)  She believed she could walk approximately two blocks in a day and estimated that she could be on her feet for less than an hour a day. (R. at 54, 57-58.)  She was unable to lift anything from the ground and would be in pain if she moved something like a grocery bag from table-top to table-top. (R. at 58-59.) She estimated that in an eight hour day, she could only stand for one hour and sit for one hour, and would need to be in a reclined or lying position for the remaining six hours.  (R. at 69.)  She thought that it would be impossible for her to work as a receptionist because she would have to lie down several hours out of an eight

hour day.  (R. at 70.)

### b. *ME's Testimony*

The ME agreed that Plaintiff had a severe impairment, which was supported by her orthopedic exams. (R. at 77.)  She testified that from January 2010 to June 2014, Plaintiff suffered from chronic pain symptoms due to degenerative disc disease in her spine, which would have been a medically-determinable physical impairment. (R. at 78.)  The ME noted that Plaintiff had scoliosis surgery as a teenager and had a fusion at L3/4 in 2007, and that she was diagnosed with meningitis and hospitalized for ten days in February 2010. (*Id.*)  The other visits to the emergency room were mostly for other types of pain, which the ME considered minor injuries. (*Id.*)  The ME noted that Plaintiff was being treated with narcotics and a muscle relaxer by her pain management doctor in 2012, and that she was seen in the emergency room after she tripped while walking her dog in April 2013.  (R. at 79.)

Although Plaintiff had a history of spinal meningitis, the ME did not consider it a severe impairment.  (R. at 81.)  She confirmed that between January 2010 and June 2014, Plaintiff's only severe impairments were chronic pain and degenerative disc disease in the lumbar spine. (*Id.*).  When asked if she met or equaled a listing during that period, the ME testified that she considered listing 1.04, but did not see support in the evidence meeting or equaling that listing. (R. at 82.)  She agreed with the ALJ that Plaintiff lacked neurological deficits that were documented. (*Id.*)  The ME also confirmed that listing 1.04 was the most relevant listing for her impairment. (*Id.*)

According to the ME, the objective medical evidence demonstrated that Plaintiff's limitations would not have been the same for the whole disability period. (R. at 82.)  In the first period, from January 1, 2010 to April 1, 2014, she rated Plaintiff's physical capabilities as "light;"  her lifting

limits would have been twenty pounds occasionally and ten pounds frequently, and she could stand and walk four to six hours out of an eight hour day with only 45 minutes to an hour continuously. (R. at 83.) She could only sit for six hours out of an eight hour day, with only two hours continuously. (R. at 83-84.) There would have been no push/pull limits other than her strength. (R. at 84.) The ME testified that Plaintiff's postural limits would have been "occasional," except for no climbing ladders, ropes, or scaffolds, and there would not have been any manipulative, visual, or communicative limits. (*Id.*) Plaintiff would have had environmental limits, requiring her to avoid concentrated exposure to moderate vibrations during that first period. (*Id.*)

The ME testified that the second limitation period was from April 1, 2014 through the time of the hearing. (R. at 84-85.) This date was based on Plaintiff's April 1, 2014 visit with Dr. Bosita for her increased back pain, and the lumbar MRI and CT scans on April 7, 2014, which revealed disc protrusion at L5-S1. (R. at 82-83.) Plaintiff would have been restricted to sedentary work and also limited to lifting ten pounds occasionally and less than ten pounds frequently. (R. at 85.) She could only stand and walk for two hours a day, with only 30 minutes continuously. (*Id.*) She would also be limited to sitting six out of eight hours, with only 45 minutes to an hour continuously. (*Id.*) Other than being proportioned to her strength, her other push/pull limits would have been restricted to "frequent" controls with the right lower extremity. (*Id.*) Her postural limits would have been the same as for the first period, and her manipulative limits would have restricted reaching overhead to "frequent." (*Id.*) There would not have been any visual or communicative limitations. (*Id.*) The ME opined that her environmental limitations would further limit her to "avoid even moderate vibration." (R. at 87.)

According to the ME, there was no medical support in the records after the date last insured

to support the degree of limitation Plaintiff described. (R. at 89.) She specifically referenced her pain management office visits from September and October of 2015, and the orthopedist visits in April and October of 2015.[16] (*Id.*) The ME reiterated that before the date last insured, there was no reasonable medical explanation and objective evidence "to the degree of limitation that she stated that would require her to be on her feet less than one hour out of eight, sit a total of less than – not more than about an hour out of eight, and be lying down five or six or reclining five to six hours out of eight." (R. at 97-98.) She confirmed that the limitations Plaintiff claimed were outside the range of reasonable medical explanation based on the objective evidence in this file. (R. at 98.)

### c.     VE's Testimony

The VE testified that he had enough information from Plaintiff's work history to classify her prior jobs. (R. at 90.) He determined she had past relevant work as a receptionist having a SVP of 5, which was skilled and sedentary. (R. at 91.) She also had past relevant work as a waitress having a SVP of 3, which was semiskilled and light. (*Id.*)

The VE reviewed Plaintiff's description of her job as a receptionist, which consisted of reception duties, answering the phone, ordering office supplies, being seated approximately seven hours a day, walking for one hour a day, and lifting less than ten pounds. (R. at 91.) He testified that based on her description, "she did a receptionist job at a higher level." (R. at 92.)

The ALJ asked the VE to consider a hypothetical person with the same background as Plaintiff with the limitations identified in her second limitation period: lift ten pounds occasionally

---

[16] The ALJ reminded the ME that Plaintiff described her limitations for four to five years going back to 2010, but the ME did not provide any response. (*See* R. at 89.)

and above ten pounds frequently[17]; stand and walk a total of two out of eight hours with only 30 minutes continuously; sit a total of six out of eight hours with only 45 to 60 minutes continuously; push/pull limit of no more than frequent right lower extremity use of foot controls; no climbing ladders, ropes, or scaffolds; all other posturals done occasionally; limited to frequent reaching overhead; and avoid even moderate vibration. (R. at 93-94.) The VE testified that such a hypothetical person could perform the same receptionist position that Plaintiff described in her work history. (R. at 94.) He agreed that this hypothetical person could also work as a receptionist as the job was normally performed in the national economy. (*Id.*) The hypothetical would preclude the waitress job because she did not have the standing or walking capacity. (*Id.*) The VE also testified that this hypothetical person did not "allow substantially the full range of sedentary, unskilled work" due to the limitations of sitting 45 to 60 minutes at a time. (R. at 94-95.)

The ALJ next asked the VE to consider another hypothetical person with the less restrictive limitations identified in her first limitation period: lift 20 pounds occasionally and 10 pounds frequently; stand and walk four to six hours, depending on the day, out of eight hours, 45 minutes continuously; no push/pull limit; all posturals occasional except no climbing ladders, ropes, and scaffolds; no manipulative, visual, or communicative limits; and avoid concentrated exposure to even moderate vibration. (R. at 95-96.) The VE affirmed that the second hypothetical was even less restrictive, so the receptionist job would be allowed, but not the waitress job because of the standing and walking limitations. (R. at 96.)

The VE agreed that the need to lie down for four or five hours out of eight hours, as

---

[17] When recounting the limitations from the second limitation period, the ALJ incorrectly stated "10 [pounds] occasionally" and "above 10 [pounds] frequently", but the actual limitation was "10 [pounds] occasionally and less than 10 [pounds] frequently." (*Compare* R. at 93 *with* R. at 85.)

previously stated in Plaintiff's testimony, would have precluded all past work and any competitive work of any sort. (R. at 96-97.) The VE also agreed that "even if she had to lie down an hour to two, not four to five out of eight," she would still have been precluded from any other competitive work, sedentary work or otherwise. (R. at 97.)

## C.  **ALJ's Findings**

The ALJ issued a decision denying benefits on February 1, 2017. (R. at 13-29.) At step one,[18] he determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2010, through her date last insured of June 30, 2014. (R. at 15.) At step two, the ALJ found that the medical evidence established that Plaintiff had a severe combination of the following impairments: lumbar degenerative disc disease with scoliosis and status post fusion at L3-4 with residual back pain.[19] (*Id.*) At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 20.)

The ALJ then determined that from January 1, 2010, through March 31, 2014, Plaintiff retained the RFC to perform light work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; sit six hours of an eight-hour workday (two hours continuously); stand and walk four to six hours in an eight-hour workday (45 minutes continuously); no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, crouching, crawling, or kneeling; and no concentrated exposure to moderate vibration. (R. at 20-22.) He also determined

---

[18]  The five-step analysis used to determine whether a claimant is disabled under the Act is described more specifically below.

[19]  There appears to be a typo as the ALJ referred to the second impairment as "status post fusion at L3-4 *this* residual back pain." (emphasis added). (*See* R. at 15.)

that from April 1, 2014, through the date last insured, Plaintiff retained the RFC to perform sedentary work with the following limitations: lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit 6 hours of an eight-hour workday (45 to 60 minutes continuously); stand and walk two hours of an eight-hour workday (30 minutes continuously); frequent control with right lower extremities; no climbing of ladders, ropes or scaffolds; frequent overhead reaching; and no exposure to moderate vibration. (R. at 22-23.)

At step four, the ALJ found that Plaintiff was capable of performing past relevant work as a receptionist through the date last insured. (R. at 23-24.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, at any time from the alleged onset date of January 1, 2010, through the date last insured of June 30, 2014. (R. at 24.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's

decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual

functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)(2012)).   Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.   The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*.   Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by VE testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).   After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he or she cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).   A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.  The ALJ applied an improper legal standard to evaluate severe impairments. As a result, the ALJ failed to consider and to evaluate vocationally significant impairments, as described by both the treating physician and the medical expert witness. The Plaintiff has been prejudiced by the ALJ's failure to consider the additional and significant impairments in assessing residual functional capacity, as doing so may have resulted in the ALJ modifying the residual functional capacity assessment. Did the ALJ properly consider all of the Plaintiff's severe impairments in determining her residual functional capacity?

2. The ALJ found that there was a significant change in Plaintiff's residual functional capacity as of April 1, 2014. This appears to be based upon the testimony of the medical expert witness. But the evidence demonstrates that there was a significant change in Plaintiff's medical condition as of March 2013 but that MRI studies were not performed until April 2014. The Commissioner has determined that the date of diagnosis is not controlling in determining the date of disability. Did the ALJ properly consider the exacerbation of Plaintiff's condition and change in her residual functional capacity?

3. The ALJ acknowledged that the Plaintiff's symptoms are severe enough to render her disabled. In his decision, however, the ALJ stated that the Plaintiff's symptoms are not severe enough to preclude all types of work. The ALJ, in boilerplate language, found that the Plaintiff's statements concerning her symptoms were not entirely credible but the ALJ failed to consider the existence of a chronic pain syndrome or assess its impact upon the Plaintiff's perception of pain. Did the ALJ properly evaluate credibility when he failed to consider the existence of a chronic pain syndrome?

4. The Plaintiff's treating physician provided a medical source statement. The ALJ gave "little weight" to this opinion. But the ALJ failed to consider all of the Plaintiff's impairments, as established in this record, nor did he consider the limitations resulting therefrom, in evaluating the opinion of the treating physician. Further, the ALJ did not refer to contravening medical evidence from a treating or examining physician in order to refute the opinion of the treating physician and failed to apply the Acting Commissioner's criteria for evaluating the medical source opinion. Did the ALJ properly consider the medical source opinion of the treating physician in determining Plaintiff's residual functional capacity?

(doc. 14 at 2-3.)

## A. __Severity Standard__

Plaintiff contends that remand is required because the ALJ used an incorrect severity standard at step 2, and that she was prejudiced because the ALJ should have found that she had severe chronic pain syndrome, herniated disc of the lumbar spine, radiculitis, neuritis, and neuropathy. (doc. 14 at 4-7.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity

27

of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Finding that a literal application of this regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Notwithstanding this presumption, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 14.) The next sentence read that "[a]n impairment or combination of impairments

28

is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id*.) However, unlike the ALJ's articulation of the severity standard, *Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work. *See Stone*, 752 F.2d at 1104. The ALJ therefore applied an incorrect standard of severity. *See Neal v. Comm. of Social Sec. Admin.*, No. 3:09-CV-0522-N, 2009 WL 3856662, at *1 (N.D. Tex. Nov. 16, 2009) ("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone*, without more, conclusively demonstrates that he applied the correct standard."); *see also Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the regulatory definition of severity that the ALJ cited in this case).

 *Stone* error does not mandate automatic reversal and remand, however; application of harmless error analysis is appropriate in cases where the ALJ proceeds past step two in the sequential evaluation process. *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* at step two but proceeded to steps four and five of the sequential evaluation process); *see also Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9 (N.D. Tex. Sept. 10, 2012) (Ramirez, M.J.), *rec. adopted in* 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012) (Fish, J.) (applying harmless error analysis to alleged *Stone* error); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011) (Toliver, M.J.) (same); *Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL 4167637, at *11 (N.D. Tex. Sept. 20, 2012) (same). "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily

dismiss, *without consideration of the remaining steps in the sequential analysis*, claims of those whose impairment is more than a slight abnormality." *Anthony*, 954 F.2d at 294 (emphasis added). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, the ALJ found at step two that Plaintiff had the following severe combination of impairments: lumbar degenerative disc disease with scoliosis and status post fusion at L3-4 with residual back pain. (R. at 15.)  After step three, he found that she had the following RFC from January 1, 2010 through March 31, 2014: only perform light work; lift and carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours of an eight-hour workday (two hours continuously); stand and walk 4 to 6 hours in an eight-hour workday (45 minutes continuously); no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, crouching, crawling, or kneeling; and no concentrated exposure to moderate vibration. (R. at 20-22.)  He also determined that she had the following RFC from April 1, 2014, through the date last insured: only perform sedentary work; lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit 6 hours of an eight-hour workday (45 to 60 minutes continuously); stand and walk two hours of an eight-hour workday (30 minutes continuously); frequent control with right lower extremities; no climbing of ladders, ropes or scaffolds; frequent overhead reaching; and no exposure to moderate vibration. (R. at 22-23.)

The ALJ explained that in assessing her RFC, he considered "all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. at 21.)  Consideration of "all of the relevant

medical and other evidence" as well as all "medically determinable impairments . . . including [those] that are not 'severe'" is required when determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(1)-(3). In his RFC narrative discussion, the ALJ acknowledged Plaintiff's "history of back pain," and that she "continued to seek treatment for back pain through the date last insured." (R. at 21.) He also acknowledged that the imaging of her back was essentially normal, despite prior surgeries. (*Id.*). He referenced Dr. Bosita's diagnoses, which included lumbosacral neuritis or radiculitis. (R. at 20.) He likewise referred to Dr. Chen's October 22, 2015 treating source statement that Plaintiff had, among other impairments, chronic pain syndrome and neuropathy. (R. at 22.) The ALJ expressly determined that her "back impairments limited [her] to work at the light exertional level," and when her condition worsened, she was further limited to sedentary work. (R. at 22-23.)

At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a receptionist. (R. at 23.) After comparing Plaintiff's RFC with the physical and mental demands of receptionist work, he concluded that "[she] was able to perform it as generally performed from January 1, 2010 through the date last insured." (R. at 24.) Although he did not separately list "chronic pain syndrome" as a severe impairment at step two, Plaintiff's "residual back pain" was expressly identified as a severe impairment. (R. at 15.) In fact, he squarely addressed the disabling impact of her pain, explaining that "[t]he issue [was] not the existence of pain, but whether the symptomatology experienced by [Plaintiff] [was] of sufficient severity as to preclude her from engaging in all types of work activity." (R. at 23.)

The ALJ also considered the symptoms and potential limitations associated with radiculitis, neuritis, and neuropathy. (R. at 20, 22.) Like degenerative disc disease, these physical impairments also cause symptoms of pain, numbness, and tingling that were associated with Plaintiff's back

issues. (R. at 17-20, 22.) Even though these specific impairments were not identified by name by all of her treating doctors, the ALJ still considered the symptomatology associated with those impairments along with her other back problems. (*Id.*) The ALJ likewise considered Plaintiff's herniated disc impairment. (R. at 22.) In fact, he specifically referenced the MRI and CT scan that revealed the herniated disc, which ultimately necessitated the more restrictive RFC that began on April 1, 2015. (*Id.*)

The ALJ's disability determination clearly shows that he still considered the effects of chronic pain syndrome, as well as Plaintiff's other impairments impacting her back problems, including herniated disc, radiculitis, neuritis, and neuropathy, on her ability to work throughout the disability analysis as required by the regulations. It is therefore inconceivable that he would have reached a different conclusion regarding the effects of Plaintiff's chronic pain syndrome, herniated disc, radiculitis, neuritis, and neuropathy on her ability to work if he had applied the correct severity standard at step two. Accordingly, the ALJ's failure to apply the *Stone* severity standard at step two was harmless error that does not warrant remand.

**B.    <u>Treating Physician Rule</u>**

Plaintiff contends that the ALJ failed to evaluate the opinions of her treating physicians in a manner consistent with the regulations. (doc. 14 at 10-12.) Specifically. she argues that the ALJ was required to perform a detailed analysis of Dr. Chen's views under the criteria set forth in 20 C.F.R. § 404.1527. (*Id.* at 11.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a

treating source. *Id.* § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views

under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Chen provided a treating source statement dated October 30, 2015, opining that from October 5, 2011 to October 22, 2015, Plaintiff suffered from chronic pain syndrome, neuropathy, scoliosis, and bilateral lower extremity radiculopathy. (R. at 782.) He determined that her physical impairments were "reasonably consistent with the pain, symptoms and functional limitations described in [his] evaluation." (R. at 782.) He opined that she would be unable to perform sustained work on a regular and continuing basis because she suffered from scoliosis and complications from multiple surgical procedures. (R. at 783.) He further opined that her pain would be severe enough to interfere with attention and concentration. (*Id.*) Dr. Chen concluded that Plaintiff's impairments or treatment would likely cause her to be absent from work more than four times per month. (R. at 784.)

As part of the RFC assessment, the ALJ expressly considered Dr. Chen's treating source statement, but ultimately gave little weight to his opinions. The ALJ first noted that the treating source statement was provided "well-after" Plaintiff's date last insured of June 30, 2014.[20] (R. at

---

[20] Though Dr. Chen's treating source statement was provided after June 30, 2014, his medical opinion was not facially invalid simply because it was outside the date last insured. *Hutchins v. Colvin*, No. 3:14-cv-1975-BN, 2015 WL 4660976 (N.D. Tex. Aug. 6, 2015). This Circuit has long recognized that "[r]etrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can be used to establish disability onset dates." *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997). To be relevant, the retrospective opinion cannot simply express an opinion on the claimant's current status; it must clearly reference the

23.)  He further noted that "Dr. Chen failed to provide any exertional or nonexertional limitations that would substantiate his opinions."  Lastly, he determined that "the record lack[ed] sufficient evidence to support Dr. Chen's opinion that [Plaintiff] was unable to sustain work on a regular and continuing basis prior to the date last insured."  The ALJ concluded that "[b]ecause of these reasons, [he] [gave] little weight to the opinions of Dr. Chen." (R. at 23.)

Plaintiff argues that the ALJ erred because he failed to evaluate the factors set forth in 20 C.F.R. § 404.1527 when he gave little weight to Dr. Chen's treating source statement. (doc. 14 at 12.)  He further contends that the ALJ "did not refer to any medical evidence to contravene the opinion of Dr. Chen, the Plaintiff's treating physician." (*Id.* at 12.)

Section 404.1527(d) does not apply to opinions that a claimant cannot work or is disabled. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (per curiam).  Treating physicians' opinions regarding a claimant's disability are legal conclusions and have no special significance. 20 C.F.R. § 416.927(e); *Frank*, 326 F.3d at 620.  Because physicians generally define "disability" in a manner distinct from the Act, an ALJ may properly reject any conclusion of disability as determinative on the ultimate issue.  *See Tamez v. Sullivan*, 888 F.2d 334, 336, n. 1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Act).  Dr. Chen opined that Plaintiff could not work on a regular basis because of her medical impairments. (R. at 782-84.)  This opinion constitutes a disability determination, which the regulations has reserved for the ALJ's ultimate determination. *See* 20 C.F.R. § 416.927(e).

---

relevant period of disability. *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (citing *Likes*, 112 F.3d at 191; *Ivy v. Sullivan*, 898 F.2d 1045 (5th Cir. 1990)).  Here, Dr. Chen clearly specified that his treating source statement was based on Plaintiff's medical condition from October 5, 2011 to October 22, 2015.  (R. at 781.)  Because that the treating source statement constituted relevant medical evidence, it would have been error to refuse to consider it solely because it was issued after the date last insured.  The ALJ considered Dr. Chen's treating source statement, however, and provided additional reasons for the weight he assigned to it. (R. at 23.)

Moreover, the ALJ's decision does show that he considered the relevant factors when analyzing and discounting Dr. Chen's opinions on Plaintiff's functional limitations. The ALJ referred to Dr. Chen's extensive treatment notes and acknowledged that he had been treating Plaintiff from October 2011 to October 2015. (R. at 17.) He noted that Plaintiff had a history of back pain and "received some pain relief with prescribed medications and treatment with Dr. Chen." (R. at 21.) Despite her pain management treatment, the ALJ pointed out that "[i]maging of [Plaintiff's] back prior to April 2014 was essentially normal, despite prior surgeries." (*Id.*) He further noted that multiple treatment notes, which were primarily written by Dr. Chen, "indicated that [Plaintiff] had full range of motion in her back, or was pleased with her medication regimen." (R. at 23.)

The ME testified that Plaintiff would have been able to work with the RFCs proposed at the October 31, 2015 hearing. (R. at 82-87.) She specifically identified the medical records, which included the treatment notes and medical opinions from Dr. Chen, that supported her medical opinion regarding Plaintiff's ability to work and functional limitations. (R. at 87-89.) The ALJ could accord greater weight to the ME's RFC findings than to Dr. Chen's opinions about Plaintiff's ability to work because an ALJ may accept a consulting physician's opinion that is well-supported over a treating physician's opinion. *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (holding that the ALJ "was justified in accepting the opinion of [a non-treating, consultative physician] . . . that was supported by the evidence, and in rejecting the [opinion] of a . . . treating physician that was contrary to the evidence.") (citing to 20 C.F.R. § 404.1526). Remand is therefore not required on this issue.

## C. Credibility of Plaintiff

Plaintiff next contends that the ALJ failed to properly evaluate her credibility and failed to

give an adequate explanation for rejecting her subjective complaints. (doc. 14 at 9-10.)

When the ALJ issued his decision, Social Security Ruling (SSR) 96–7p[5] required him to follow a two-step process for evaluating a claimant's subjective complaints. 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id*. Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. *Id.*; *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994)(citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. SSR 96–7p, 1996 WL 374186 at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

> 1. the claimant's daily activities;

---

[5] Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1020935 at *1 (S.S.A. Mar. 16, 2016). When the ALJ issued his decision here, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility." SSR 96-7P, 1996 WL 374186 at *7 (S.S.A. July 2, 1996). His credibility finding is properly analyzed under SSR 96-7p. *See Mayberry v. Colvin*, No. CV G-15-330, 2016 WL 7686850 at *5 (S.D. Tex. Nov. 28, 2016), *adopted by* 2017 WL 86880 (S.D. Tex. Jan. 10, 2017) (noting that "[b]ecause the text of SSR 16–3p does not indicate the SSA's intent to apply it retroactively, the Court would be disinclined to do so"). Even if SSR 16-3p applied retroactively, however, the outcome on this issue would not differ.

2. the location, duration, frequency, and intensity of pain or other symptoms;

3. factors that precipitate and aggravate symptoms;

4. the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;

5. treatment, other than medication, for relief of pain or other symptoms;

6. measures other than treatment the claimant uses to relieve pain or other symptoms (*e.g.*, lying flat on his or her back);

7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*, 27 F.3d at 164. The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

Here, the ALJ explained the proper standard and two-step analysis for evaluating subjective complaints and symptoms based "on a consideration of the entire case record." (R. at 21.) He noted that the objective medical evidence clearly established that Plaintiff had a history of back pain and

38

previous back surgeries, and that she continued to seek treatment for her back pain. (*Id.*) Proceeding onto the second step, he considered her testimony that she had difficulties getting dressed and bending over to do other personal needs. (R. at 15.) He also noted her testimony that she could assist her husband with some of the household chores, sit and help her son with his homework an hour a day, sit and watch TV for approximately two hours, attend doctor appointments, and drive herself. (*Id.*) The ALJ also considered the treatment notes and medical opinions from her doctors throughout the alleged period of disability. (R. at 16-20, 23.) He noted that she attended pain management in an attempt to alleviate her pain, and she received some pain relief from the prescribed medications and treatment with Dr. Chen. (R. at 21.) Notwithstanding her prior back surgery, the ALJ reported that imaging of her back "was essentially normal." (*Id.*)

The ALJ found overall that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but her allegations concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible because the medical evidence did not fully support her testimony. (R. at 23.) He determined that her medical records failed to support her claim that she was unable to sit, stand, or walk for more than a combined period of two hours per day, as well as her claim that she had to lie down or be in a reclined position for six hours. (*Id.*) He specifically noted that multiple treatment notes indicated that Plaintiff had full range of motion in her back, and she was satisfied with her medication regimen. (*Id.*) Moreover, he gave great weight to the ME's opinion and her testimony that "the record did not support greater limitations or a more reduced residual functional capacity." (*Id.*) Although not in a formalistic fashion, the ALJ did properly assess Plaintiff's subjective complaints and severity of her limitations as required under the Social Security Regulations. *See Falco*, 27 F.3d at 164.

The ALJ must consider subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Courts, moreover, have articulated that the lack of objective medical evidence or treatment may support an ALJ's adverse credibility ruling. *See Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (recognizing "that an absence of objective factors indicating the existence of severe pain–such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition–can itself justify the ALJ's conclusion"); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (stating that the ALJ was not precluded from relying on the lack of prescribed treatment as an indication of nondisability). Additionally, the ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier*, 944 F.2d at 247.

Here, the ALJ specifically considered Plaintiff's claims that her pain was totally disabling. (R. at 23.) He determined that although the symptoms and pain "experienced by [her] [were] limiting, [] when compared with the total evidence, [they] [were] not severe enough to preclude all types of work." (*Id.*) Plaintiff has not shown that the ALJ erred in his analysis, particularly because his decision shows that he properly considered the record as a whole. *See Lopez v. Astrue*, 854 F. Supp. 2d 415, 424-25 (N.D. Tex. 2012) (finding that the ALJ properly evaluated the plaintiff's credibility by expressly acknowledging that he "experienced some level of pain and functional loss, but concluded that [the] plaintiff's subjective complaints of pain were out of proportion to the objective medical evidence"). Because substantial evidence supports the ALJ's credibility finding, remand is not required on this issue.

**D.**    **Plaintiff's Onset Date**

Plaintiff contends that the ALJ erred in finding that her RFC became more restrictive as of April 1, 2014, because the evidence suggests that the increased severity of her medical impairments actually occurred several months prior to this date. (doc. 14 at 9.)  In other words, Plaintiff is arguing that the onset date restricting Plaintiff to sedentary work, as determined by the ALJ, was erroneous and not supported by the medical evidence.

"The onset date of disability is the first day [a claimant] is disabled as defined in the Act and the regulations."  *Titles II and XVI: Onset of Disability*, SSR 83–20, 1983 WL 31249, at *1 (S.S.A. 1983).  "SSR 83-20 prescribes the policy and procedure" for determining the onset date.  *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993).  If the impairment is of traumatic origin, the onset date "is the day of the injury."  SSR 83–20, 1983 WL 31249, at *2.  If it is of non-traumatic origin, that is, if it is a "progressive" impairment, three factors must be considered: "the individual's allegations, the work history, and the medical evidence."  *Spellman*, 1 F.3d at 361.  Although the starting point is the "claimant's allegation as to when the disability began, ... and the date that his disability caused him to stop work[ing] is often very significant," "the medical evidence is the primary element."  *Id.* (citing SSR 83-20, 1983 WL 31249, at *2).

With respect to slowly progressive impairments, such as degenerative disc disease, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," and the onset date must therefore be inferred.  SSR 83-20, 1983 WL 31249, at *2.  The claimant's alleged onset date is adopted "if it is consistent with all the evidence available."  SSR 83-20, 1983 WL 31249, at *3; *accord Spellman*, 1 F.3d at 361.  Where precise evidence of the onset date is not available, SSR 83-20 instructs that:

> [I]t may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

*Id.*

The Fifth Circuit has held that SSR 83-20 requires the ALJ to consult a medical advisor to infer an onset date where the claimant suffers from a slowly progressive impairment and ambiguous medical evidence surrounds the onset date. *See Spellman*, 1 F.3d at 362-63 (finding that because the medical evidence was "ambiguous" due to the gap in the record, the onset date established by the Appeals Council was "arbitrary" and not based on a "legitimate medical basis" since "nothing in the record suggested that [the date chosen] was significant with regard to [the claimant's] disability" and remanding with instructions to "consult a medical advisor in redetermining the onset date of [the claimant's] disability"). If the medical evidence is insufficient to make such an inference, the ALJ may consult other sources of information, such as lay testimony from family members, friends, or former employers. *See* SSR 83-20, 1983 WL 31249, at *3.

The Fifth Circuit has not yet determined whether an ALJ may reject a claimant's stated onset date and select a later date where the medical evidence sufficiently demonstrates the advancement of his or her slowly progressive impairment.[6] In a different context, however, it has held that an ALJ

---

[6]  *Spellman* did distinguish the facts before it from those in *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). 1 F.3d at 362, n. 8. In *Pugh*, the Seventh Circuit held that substantial evidence supported the ALJ's finding that the onset of the claimant's disability was over three years after the date alleged because the ALJ's determination was based on "a relatively complete medical chronology of [the claimant's] medical condition." 870 F.2d at 1273, 1278–79 & n. 9; *see also McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 428 (6th Cir. 2006) (unpublished) (holding that substantial evidence supported the ALJ's determination that the claimant's onset date was over four years after his alleged date where the ALJ "developed and carefully reviewed" the medical record).

may reject a claimant's alleged onset date "if [his] reasons are articulated and the reasons given are supported by substantial evidence." *Loza*, 219 F.3d at 394 (citing *Ivy*, 898 F.2d at 1048 and *Spellman*, 1 F.3d at 361). Ultimately, the ALJ should set the onset date as "the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the [claimant] from [working]" and should give "[c]onvincing rationale ... for the date selected." SSR 83-20, 1983 WL 31249, at *3.

Here, the ALJ determined that from January 1, 2010 through March 31, 2014, Plaintiff had the RFC to perform "light work" with additional physical limitations. (R. at 20.) He also determined that because Plaintiff's medical impairments worsened as of April 1, 2014, her RFC was further limited to sedentary work with additional physical limitations. (R. at 22.) Acting in conformity with SSR 83-20, he consulted with the ME to determine the onset date of Plaintiff's greater exertional limitations. (R. at 21-22.) The ME referred to Plaintiff's April 1, 2014 visit with Dr. Bosita, during which she complained of severe back pain, and a lumbar MRI performed on April 7, 2014, which revealed disc protrusion at L5-S1. (R. at 22, 82-83.) According to the ME, those medical records indicated that Plaintiff had further limitations with an onset date of April 1, 2014. (*Id.*) Giving significant weight to the opinions of the ME, the ALJ found that "since April 1, 2014, [Plaintiff] was limited to sedentary work, with additional postural, manipulative and environmental limitations." (R. at 22.)

Plaintiff argues that the onset determination "is inconsistent with the evidence" because she presented to Texas Back Institute on March 14, 2013, complaining of severe low back pain caused when she slipped in an airport bathroom. (doc. 14 at 8.) She was observed as sitting uncomfortably, having difficulty getting out of a chair, and her gait was antalgic. (R. at 423.) An x-ray of her lumbar spine taken on December 5, 2013, revealed 14 degrees of right convex scoliosis, and an x-ray

of her thoracic spine found 10 degrees of right convex scoliosis in the mid thoracic spine and 18 degrees of left convex scoliosis in the lower thoracic spine. (R. at 641, 643.)

Even though the medical evidence showed that Plaintiff suffered from several impairments during the period at issue, substantial evidence supports the ALJ's conclusion that these impairments did not become sufficiently severe as to prevent her from doing light work until April 1, 2014. *See Halterman ex rel. Halterman v. Astrue*, No. CIV.A. 11-0630, 2012 WL 3764051, at *11 (W.D. La. July 20, 2012), *report and recommendation adopted*, 2012 WL 3762470 (W.D. La. Aug. 29, 2012) (holding that although the "evidence was not uniform and could have supported a different [RFC]," substantial evidence supported the ALJ's finding that the claimant was able to work between his alleged onset date and the onset date established by the ALJ); *see also Jones v. Astrue*, No. CIV.3:09CV590, 2010 WL 2306151, at *2 (E.D. Va. June 3, 2010), *aff'd sub nom. Jones v. Comm'r of Soc. Sec.*, 414 F. App'x 532 (4th Cir. 2011) (holding that substantial evidence supported the ALJ's selection of "the date of a consultative examination" as the claimant's onset date where "the medical record presented clear evidence documenting the progression of [the claimant's] condition," and the examination "marked the first time a physician opined that [the claimant] had such limitations as to ultimately render him disabled"); *but see Durden v. Astrue*, No. 4:07-CV-865, 2008 WL 8053430, at *7 (S.D. Tex. Jan. 29, 2008) (finding that "[a]lthough the ALJ did not choose the onset date out of thin air, it [did] not correspond to any particular date in the progression of [the claimant's] impairment," but corresponded "only to the date that [a physician] signed [a] medical source statement"). He consulted with the ME who referenced the relevant medical records and provided convincing rationale for the onset dates for both RFC determinations. (R. at 20-23.) He gave great weight to the opinion of the ME and adopted both onset dates. (*Id.*) The record shows that

substantial evidence supports the ALJ's determination of Plaintiff's onset date of April 1, 2014, and remand is therefore not required on this issue.

### IV. CONCLUSION

It is **ORDERED** that the Commissioner's decision is **AFFIRMED**.

**SIGNED** on this 24th day of September, 2018.

BARBARA M. G. LYNN
CHIEF JUDGE